UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID C. MCCOURT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| SULLIVAN & ASSOCIATES ) | |
| ARCHITECTS, INC., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT AND JURY DEMAND

### i. Introduction

1.       This is a residential construction dispute between David C. McCourt ("Mr. McCourt"), acting on behalf of the trust for the benefit of his children that owns the property at issue (the "Trust"), and the design professionals that Mr. McCourt retained to design, oversee and administer construction of a guest house on his property and be his "eyes and ears" on the ground, Sullivan & Associates Architects, Inc. ("Sullivan").  The property is located on Chappaquiddick, an island next to Martha's Vineyard, and the primary structure already on the property is Mr. McCourt's vacation home.  The project that Mr. McCourt retained Sullivan to design and oversee was the construction of a freestanding guest house on the property.

2.       Mr. McCourt put the Project in the hands of Sullivan.  Sullivan opened its hands and dropped the Project.

3.       Sullivan abdicated all its obligations and duties to Mr. McCourt.  It insisted upon a contractor who Sullivan knew had a bad reputation and was ill-suited to the Project (but claimed to Mr. McCourt was a perfect fit).  It then failed to monitor the contractor's work,

notwithstanding repeated assurances that Sullivan would function as Mr. McCourt's eyes and ears on the ground. It approved every one of the contractor's invoices including where those invoices were for work never performed or materials never purchased, unauthorized work, work in violation of the building code, and work that was left exposed to the elements. Even as it was approving those invoices for Mr. McCourt to pay, Sullivan maintained time and again that the Project was going well and the contractor was doing a good job. These were all lies.

4.     In the end, the overbilled, not-to-code, and incomplete work which Sullivan approved was destroyed by the elements where Sullivan failed to ensure the Project was weather proofed. As a result, Mr. McCourt then needed to start the Project over from scratch, thus incurring double the costs it would have if the Project had been done right the first time.

5.     Fundamentally, Mr. McCourt brings this action to recover the damages which Sullivan caused by electing to close its eyes to the myriad problems which the contractor it selected and insisted upon caused in defiance of its legal responsibilities. Mr. McCourt currently estimates his damages caused by Sullivan to exceed $2.2 million, but that number continues to grow as additional damage occurs and problems are uncovered.

## ii. Parties

4.     Mr. McCourt is a resident of, and domiciled in, the State of Florida.

5.     Upon information and belief, Sullivan is a Massachusetts business corporation with a principal place of business located at 52 Narragansett Avenue, P.O. Box 989, Oak Bluffs, Dukes County, Massachusetts 02557.

## iii. Jurisdiction and Venue

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different states and the amount in controversy exceeds $75,000.

7.      This Court has personal jurisdiction over Sullivan as it is a Massachusetts business corporation with a principal place of business in Dukes County, Massachusetts.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

### iv. Facts

**A.      Mr. McCourt's Selection of Sullivan for Design and Construction Administration**

9.      Through the Trust, Mr. McCourt owns a vacation home located in Chappaquiddick, Massachusetts. Approximately a decade ago, Mr. McCourt hired Sullivan to design, oversee and administer construction of a stand-alone guest house on his property (the "Project").

10.     Mr. McCourt intentionally hired Sullivan – including for construction administration – because it was a local architectural firm, and as a result, could be nearby the Project to check in on the work being performed and approve invoices for that work.  Having Sullivan handle construction administration was an essential component of the arrangements that Mr. McCourt wanted to establish, and Mr. McCourt agreed to pay Sullivan handsomely to be his eyes and ears on the ground for precisely this reason.

11.     As part of the deal, Sullivan agreed to scrutinize all invoices on the project to ensure their accuracy and particularly to ensure that Mr. McCourt was not overbilled for work that was not completed, work that was completed in an unsatisfactory manner, work and materials that were outside the bounds of the Project, or billed in a manner that was contrary to any agreements with Sullivan or any other vendor, contractor, or subcontractor on the Project.

12.     Mr. McCourt trusted and was particularly reliant on Sullivan to do so, as he spent significant time in London for business and was to have, and did have, the Pennsylvania-based accounting office of his company, Granahan McCourt Capital, pay the Sullivan-approved invoices directly without Mr. McCourt's review.

13.     While Sullivan began working on the Project roughly a decade ago, the Project was later put on hold for personal reasons.  In 2021, Mr. McCourt was ready to proceed and to commence construction.

**B.     Sullivan's Selection of James Wasserloos as Project Contractor**

14.     Sullivan was put in charge of locating a contractor for the Project in 2021.

15.     In the midst of the COVID-19 pandemic, when high-end residential construction in places like Martha's Vineyard was booming, finding the right contractor was especially important.  The importance of locating the right contractor was heightened for this Project, in particular, with Mr. McCourt being in London and not being present at the Project site to monitor construction progress.

16.     Sullivan urged Mr. McCourt to hire James Wasserloos ("Mr. Wasserloos") and his company Water Grove Corporation as the contractor for the Project.  Sullivan represented to Mr. McCourt that Sullivan had worked with Mr. Wasserloos in the past and that he would be capable of constructing the Project as designed.

17.     When Mr. McCourt took time to consider Sullivan's suggestion that he hire Mr. Wasserloos, Sullivan pushed Mr. McCourt to move more quickly to hire Mr. Wasserloos in the fall of 2021, as Mr. Wasserloos was considering taking another job that would preclude him from working on the Project.  For example, on November 23, 2021, William "Chuck" Sullivan emailed McCourt, writing as follows:

> Jamie called this morning with concerns about the project, he needs some commitment from you (the deposit) to continue coordinating with subcontractors and to hold a spot in his schedule.
>
> He thought we'd be much further along by this point, he had figured he woudl [sic] be done with the exterior by the first of the year and it has dragged out and is now conflicting with other projects he has lined up.

A copy of this email is attached as **Exhibit A**.

18.     Sullivan repeatedly assured Mr. McCourt that he would regularly check in on Mr. Wasserloos' work, approve every invoice Mr. Wasserloos submitted, and function as Mr. McCourt's eyes and ears on the ground.

19.     As one example only, on November 30, 2021, Sullivan's representative and employee on this Project, Nelson Giannakopouls ("Mr. Giannakopouls"), sent an email to Mr. McCourt promising that "We will stay on top of [Mr. Wasserloos].  I'll be in constant communication with him throughout the rest of the construction."  A copy of this email is attached as **Exhibit B**.

20.     Sullivan's assurances played a critical role in Mr. McCourt's decision to hire Mr. Wasserloos.  Ultimately, at Sullivan's urging, Mr. McCourt put his trust and confidence in Sullivan to ensure there would be sufficient oversight over Mr. Wasserloos, and Mr. McCourt agreed to hire Mr. Wasserloos.  Sullivan accepted that trust and confidence and was paid handsomely for it.

21.     Mr. Wasserloos began work on the Project in the fall of 2021, and, pursuant to Sullivan's agreement with Mr. McCourt, forwarded his invoices to Sullivan to review and approve.  Sullivan did, in fact, represent that it had reviewed each of Mr. Wasserloos' invoices, that the work billed for had been performed and the materials billed for had been purchased, and approved the invoices for Mr. McCourt's accounting office at Granahan McCourt Capital to pay.

22.     Sullivan's form of approval of Mr. Wasserloos' invoices included a combination of emails to Granahan McCourt Capital accounting personnel, signatures on actual invoices and stamping "approved" on invoices.  In most cases, Sullivan did all three.  There was never a circumstance where Sullivan did none.

23. Mr. McCourt's accounting office at Granahan McCourt Capital paid Mr. Wasserloos' invoices based on Sullivan's representations that the invoices were accurate and fairly represented the work that had been performed and materials that had been purchased.

24. Indeed, if Mr. Wasserloos was ever looking for a payment to be made, he would call Sullivan, not Mr. McCourt or Granahan McCourt Capital accounting personnel, to ask for his invoices to be approved for payment.

**C.     Mr. McCourt's Visits in August 2022 and August 2023**

25. Mr. McCourt visited the property in August 2022.  Mr. McCourt was displeased with the lack of progress, something he told Mr. Wasserloos and Sullivan directly.  He was there with his fiancé for leisure, and unable to fully assess the work that had been performed.

26. Before leaving, Mr. McCourt ensured during his August 2022 visit that the new, very incomplete structure had been boarded up and made weather tight in advance of the weather turning in the fall and winter.  The structure had been made weathertight, with a layer of plywood covered in a layer of plastic.

27. Mr. McCourt left to return to London with the continuing expectation that Sullivan would provide oversight to the Project, that Mr. Wasserloos would be more present on the site and would complete work more expeditiously, and that the work was not exposed to the elements.  Indeed, Sullivan made exactly those representations to Mr. McCourt.

28. Other than a short visit in April 2023 when Mr. McCourt confirmed that the Project remained weathertight (but remained displeased with the lack of progress), Mr. McCourt returned to his home on Martha's Vinyard for an extended period in August 2023.  At this point, Mr. McCourt had paid Mr. Wasserloos nearly another $500,000.

29.     When he arrived at the site in August 2023, Mr. McCourt found that not only was there still no significant progress on the Project, but that the progress that had been made had been entirely ruined because of the Sullivan's failings.

30.     The job site was disorganized and chaotic; debris littered the site and materials and trash were strewn about.  Upon inspection, it became clear that even work that had been done was not done to code and would have to be re-done.  Photographs Mr. McCourt took of the construction site from this August 2023 visit are attached as **Exhibit C**.

31.     Most alarmingly, for no apparent reason, the plywood and plastic that had been used to make the Project weathertight since at least the prior year had been removed from the structure and the plywood had been removed from the site.  As a result, the structure had become exposed to the elements and had deteriorated significantly due to the cold and moist salty air.

32.     The Project site was in such poor condition that, when Mr. McCourt's insurer came to view the property, it promptly cancelled Mr. McCourt's insurance policy.

**D.     Mr. McCourt Learns that Sullivan Had Not Overseen Mr. Wasserloos As Promised**

33.     Immediately after this August 2023 visit, Mr. McCourt terminated Mr. Wasserloos and Sullivan and hired a new consultant to assess the damage to the Project, the work that had already been completed, and what needed to be done and redone.

34.     The results of that investigation made abundantly clear that Sullivan had not fulfilled its obligation to act as Mr. McCourt's eyes and ears on the Project as construction administrator.

35.     To the contrary, Mr. McCourt learned that had Sullivan actually taken reasonable steps to monitor the Project and reconcile work performed with Mr. Wasserloos' invoices, red flags existed since the inception of the Project that should have alerted Sullivan that Mr.

Wasserloos was not capable of constructing the Project and was billing for work that was not performed and materials that were not delivered.

36.     For example, Sullivan sent Mr. McCourt Mr. Wasserloos' second invoice, Invoice No. 2058, for payment on February 3, 2022.  A copy of this invoice is attached as **Exhibit D**.  In his email forwarding the invoice, Mr. Giannakopouls wrote "I have reviewed the invoice and confirm that the amount being billed is commensurate with the work completed and stored to date."  A copy of that email is attached as **Exhibit E**.  McCourt paid the invoice in full in reliance on Sullivan's email approval.

37.     It is inconceivable that Mr. Giannakopouls actually reviewed this invoice or cross-checked it with the work performed or Mr. McCourt's contract with Mr. Wasserloos for accuracy.  As one obvious example, Invoice No. 2058 (and several subsequent invoices) included a 20% builder fee to be paid to Mr. Wasserloos even though his contract with Mr. McCourt, attached as **Exhibit F**, only permitted an 18% fee.  Given how little Sullivan knew of Mr. Wasserloos and how much it knew Mr. McCourt was relying on his eyes and ears on the ground, Sullivan needed to do as promised and "stay on top of" Mr. Wasserloos.  Focusing on something as simple as the percentage builder fee, Sullivan did not do so.

38.     On March 10, 2022, Wasserloos issued Invoice No. 2061, attached as **Exhibit G**, for a total of $227,920.45.  Again, Sullivan approved the invoice before forwarding to Mr. McCourt for payment.  Sullivan's approval of the invoice was unthinkable upon close examination.

39.     Among other things, Invoice No. 2061 included $92,399.46 for "Balance due" on "utility connections" applying a prior deposit of $199,740.29 to bring the total paid on this item to $292,139.75.  Mr. Wasserloos did not do that work. No utilities were ever connected during

Mr. Wasserloos' tenure, let alone in early 2022.  A simple visit to the site before approving Invoice No. 2061 (which was necessary to monitor work on the Project) would have revealed that no utility connections had been accomplished at this time.  This would have been an immediate red flag that something was going very wrong with this Project.

40.     This same invoice also included a $34,000 entry for IPE decking even though Invoice 2058 had an entry for the same amount as a "Deposit" on the same supplies.  Sullivan approved this invoice without any backup as to why an additional $34,000 was necessary.  When Mr. McCourt visited the property that month, he was stunned to see a mere $6,000 worth of IPE decking onsite after having paid $68,000 for this material.

41.     Sullivan's own invoices make clear why Sullivan failed to recognize these significant discrepancies in Mr. Wasserloos' invoicing.  Despite knowing that McCourt was counting on its representation that it would closely monitor Mr. Wasserloos' progress—and the fact that Sullivan was a local architect, based on Martha's Vineyard, Sullivan did not visit the Project a single time between January 1, 2022 and April 3, 2022.  In all of 2022, based on receipts for ferry rides from Edgartown, which is on Martha's Vineyard, to the island of Chappaquiddick, which is across Edgartown Harbor, Sullivan only visited the Project three times, on January 1st, April 3rd and May 4th.

42.     Mr. Wasserloos' next invoice, Invoice No. 2069, attached as **Exhibit H**, did not come until July 9, 2023, and was only for $59,290.28, despite this being the height of the building season.  That invoice contained nonsensical entries, five of which post-dated the date of the invoice and otherwise had discrepancies in item dates.  Further, this invoice contained a $30,000 deposit for cabinets and vanities—items that were not even in the scope of Mr. Wasserloos' contract with Mr. McCourt.

43.     Invoice Nos. 2077, attached as **Exhibit I**, and 2078, attached as **Exhibit J**, are equally problematic for Sullivan.  In the former, Sullivan approved $54,371.89 for deposits on appliances that, like the cabinets and vanities, were plainly outside the scope of Mr. Wasserloos' contract and, in reality, Mr. McCourt did not even select until after Mr. Wasserloos was terminated.  There is no explanation for Sullivan approving this amount, especially where the backup Mr. Wasserloos provided for this purchase was a then-four-month-old unsigned "quote" addressed to Mr. McCourt's decorator.  Further, Sullivan failed to even recognize that the charge he approved for appliances were never delivered to the Project.

44.     Similarly, Invoice No. 2078 included entries for work that was never actually performed, something Sullivan would have known had it visited the property after May in 2022.  And Invoice Nos. 2077 and 2078 both included the mistaken 20% builder fees instead of the contractual rate of 18%, yet another oversight by Sullivan.

45.     Sullivan did not undertake reasonable efforts to comply with its agreed-to obligations, despite being paid more than $125,000 by Mr. McCourt for doing so.

46.     This is particularly egregious because, as Mr. McCourt later learned, Sullivan had almost no experience working with Mr. Wasserloos prior to the Project, other than a single landscaping job.  Nor did Mr. Wasserloos have a good reputation in the local building community.  On the contrary, on information and belief, Mr. Wasserloos had recently been kicked off of a building project for poor workmanship, a fact that Sullivan—who was actively involved in the local building community—would have well known.

47.     Had Sullivan advised Mr. McCourt of its limited experience with Mr. Wasserloos and Mr. Wasserloos' poor reputation on Martha's Vineyard, Mr. McCourt would not have agreed to hire Mr. Wasserloos as the contractor.

48.     Further, Sullivan's utter failure to recognize deficiencies in Mr. Wasserloos' work and billing practices fell far below the standard of care for a residential architect.  This duty was only heightened by Sullivan's knowledge that Mr. McCourt was in London and its agreement to act as Mr. McCourt's eyes and ears on the Project, to stay on top of Mr. Wasserloos, and to review and confirm the accuracy of each and every charge from Mr. Wasserloos.

49.     Sullivan failed to make any reasonable effort to comply with its obligations. As a result, the Project was not built to code, was exposed to the elements resulting in severe damage to the portions of the building that had been completed, and Mr. McCourt paid for items that never should have been billed.

50.     Moreover, because of the poor condition Mr. Wasserloos left the building in, it will cost significantly more to repair and complete the Project than it would have taken to build the house in the first instance, had it been properly constructed. These efforts are ongoing.

51.     Mr. McCourt currently estimates his damages caused by Sullivan to exceed $2.27 million, but that number continues to grow as additional damage occurs and problems are uncovered.

## <u>Count One – Breach of Contract</u>

52.     The allegations set forth above are re-alleged and incorporated herein by reference.

53.     There is a binding and enforceable contract between Sullivan and Mr. McCourt.

54.     Among other material terms, through that contract Sullivan agreed to oversee and manage all aspects of the Project, including acting as Mr. McCourt's proxy, including reviewing all invoices related to the Project for accuracy, completeness, and that the work completed on the Project comported with the invoices and with the building code.  Sullivan further agreed to

ensure that work on the Project was completed according to the Project design plans, according to code, and expeditiously.

55.     Sullivan breached that contract by failing to identify myriad issues with Mr. Wasserloos' bills, including, among other things, (a) invoices for work that was not completed; (b) invoices for work that was poorly completed; and (c) work that was not completed to code.

56.     Indeed, under Sullivan's watch, the Project was not completed, much of the work was done not to code, and the work which was completed was left exposed to the elements and destroyed.

57.     As a result of Sullivan's breaches, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

**Count Two – Breach of the Implied Covenant of Good Faith and Fair Dealing**

58.     The allegations set forth above are re-alleged and incorporated herein by reference.

59.     Mr. McCourt and Sullivan reached a binding and enforceable contract for Sullivan to manage and oversee the Project as a proxy for Mr. McCourt.  Inherent in every Massachusetts contract is the covenant of good faith and fair dealing, which means that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

60.     Sullivan breached the implied covenant of good faith and fair dealing by utterly failing to perform any oversight of the Project, approving incorrect and falsely inflated invoices, and allowing it to fall into terrible disrepair.

61.     As a result of Sullivan's breaches, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

**Count Three – Fraud**

62.     The allegations set forth above are re-alleged and incorporated herein by reference.

63.     Sullivan represented to Mr. McCourt that Mr. Wasserloos had an excellent reputation and that, including based upon Sullivan's substantial experience with Mr. Wasserloos, Mr. Wasserloos was an excellent choice to be the contractor for the Project.  Sullivan represented to Mr. McCourt that it was continuing to oversee and manage the Project to ensure that all work was being completed expeditiously, to code, and efficiently.  Sullivan represented to Mr. McCourt that it was scrutinizing Mr. Wasserloos' bills to ensure that they were accurate and truthful prior to approving the invoices for payment.

64.     At the times Sullivan made each of the above representations, it knew that each of the representations were untrue or recklessly disregarded the truth in making them.

65.     Mr. McCourt relied upon Sullivan's representations.

66.     As a result, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

**Count Four – Negligent Misrepresentation**

66.     The allegations set forth above are re-alleged and incorporated herein by reference.

67.     Sullivan represented to Mr. McCourt that Mr. Wasserloos had an excellent reputation and that, including based upon Sullivan's substantial experience with Mr. Wasserloos, Mr. Wasserloos was an excellent choice to be the contractor for the Project.  Sullivan represented to Mr. McCourt that it was continuing to oversee and manage the Project to ensure that all work was being completed expeditiously, to code, and efficiently.  Sullivan represented to Mr.

McCourt that it was scrutinizing Mr. Wasserloos' bills to ensure that they were accurate and truthful prior to approving the invoices for payment.

68.     At the times Sullivan made each of the above representations, it would have recognized that they were untrue if it had exercised due care.

69.     Mr. McCourt relied upon Sullivan's representations.

70.     As a result, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

### Count Five – Negligent Supervision

71.     The allegations set forth above are re-alleged and incorporated herein by reference.

72.     Sullivan agreed to supervise Mr. Wasserloos at all relevant times.

73.     By, without limitation, failing to monitor Mr. Wasserloos work, including, among other things, the quality of his work, whether the work complied with the building code, and ensuring that Mr. Wasserloos was working, Sullivan failed to use reasonable care.

74.     As a direct and proximate result, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

### Count Six – Violation of G.L. c. 93A, §§ 2, 9

75.     The allegations set forth above are re-alleged and incorporated herein by reference.

76.     Sullivan is engaged in trade or commerce in Massachusetts.

77.     The wrongful conduct alleged above occurred in Massachusetts.

78.     The wrongful conduct alleged above amount to unfair and deceptive trade practices under G.L. c. 93A, § 2.

79.     Mr. McCourt sent a demand letter pursuant to G.L. c. 93A, § 9 at least 30 days prior to filing this lawsuit.

80.     Sullivan's unfair and deceptive trade practices were willful and knowing.

81.     Sullivan's unfair and deceptive trade practices, among other things, resulted in violations of the building code.

82.     As a result, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

## Count Seven – Violation of G.L. c. 142A

83.     The allegations set forth above are re-alleged and incorporated herein by reference.

84.     At all relevant times, Mr. McCourt was acting as an agent of the Trust, a homeowner, and Sullivan is a contractor within the meaning of G.L. c. 142A.

85.     The conduct alleged above by Sullivan is violative of G.L. c. 142A, §§ 2, 17.

86.     As a result, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

## Count Eight – Breach of Fiduciary Duty

87.     The allegations set forth above are re-alleged and incorporated herein by reference.

88.     Sullivan was a fiduciary of Mr. McCourt, including where it agreed to act as his proxy and "eyes and ears" as to the construction of the Project and thereby accepted the trust and confidence imposed upon Sullivan.

89.     Sullivan breached its fiduciary duty to Mr. McCourt through the conduct described above.

- 15 -

90.     Sulivan also repeatedly reassured Mr. McCourt that Mr. Wasserloos was properly constructing the Project and that his bills accurately reflected his work.

91.     In reality, Mr. Wasserloos was not constructing the Project appropriately and was not billing for his work properly.

92.     Among other things, Sullivan improperly approved of bills for:

    a) work that was not actually performed or materials that were not actually purchased;

    b) work performed or materials purchased that was plainly outside of the scope of the builder's authority;

    c) work that was not done to code in conformance with the approved plans or in a workmanlike manner; and

    d) work that was left exposed to the elements during the 2022-2023 winter and not properly protected under industry standards and was, therefore, ruined.

93.     The wrongful conduct alleged above occurred in Massachusetts.

94.     As a result, Mr. McCourt has suffered, and will continue to suffer, substantial damages in an amount to be proved at trial.

### Count Nine – Declaratory Relief

95.     The allegations set forth above are re-alleged and incorporated herein by reference.

96.     An "actual controversy" within the meaning of 28 U.S.C. § 2201 exists between Mr. McCourt and Sullivan as to whether Sullivan is legally responsible for damages caused to Mr. McCourt by Sullivan and Mr. Wasserloos under tort and/or agency principles because of Sullivan, among other things, (a) being responsible for approving of and certifying the work done by Mr. Wasserloos, (b) agreeing to closely monitor the work that Mr. Wasserloos did on the Project, to "stay on top" of him, and to "be in constant communication with him throughout

the rest of the construction," (c) agreeing to review Mr. Wasserloos' invoices, confirm that they were accurate and commensurate with work performed and materials purchased for the Project, and certify that they should be paid, and (d) certifying work as performed and for which Sullivan confirmed Mr. McCourt should pay that was not done, was not done to code, was outside the scope of Mr. Wasserloos' contract, and was for goods and services that Mr. Wasserloos had not in fact obtained for the Project.

97.    Pursuant to 28 U.S.C. § 2201, this Court should declare the rights of the parties including, without limitation, that Sullivan is legally responsible for all damages caused to Mr. McCourt by Sullivan and Mr. Wasserloos.

## v. <u>Prayer for Relief</u>

**WHEREFORE**, Mr. McCourt respectfully requests that the Court grant him the following relief:

i.     Enter judgment in favor of Plaintiff and against Defendant on each of the Counts asserted herein, and award them all damages allowed by law and as determined by a jury, as well as statutory interest;

ii.    Declare that Defendant is responsible for the full extent of any damages caused to Plaintiff by Sullivan and Mr. Wasserloos;

iii.   Award Plaintiff damages, including punitive damages, as allowed by G.L. c. 93A, §§ 2 and 9 caused by Defendant's unfair or deceptive acts or practices under M.G.L. c. 93A, and all other damages permitted by law, plus interest from the date of the original Complaint, plus costs and attorneys' fees in favor of the Plaintiff; and

iv.    Grant Plaintiffs such other and further relief as is just and warranted.

## vi. <u>Jury Demand</u>

Plaintiffs demand a trial by jury on all counts so triable.

Respectfully submitted,

DAVID C. MCCOURT,
By his attorneys,

 /s/ Matthew S. Furman
Maria T. Davis (BBO No. 543842)
Matthew S. Furman (BBO No. 679751)
William Gildea (BBO No. 699112)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02109
Tel:     (617) 720-2626
Email:  mdavis@toddweld.com
              mfurman@toddweld.com
              wgildea@toddweld.com

Dated:  May 6, 2024